UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
MARK G. STROM and BERNEE D. STROM,  )
                                           )
                     Plaintiffs, )
     v. )
                                           )
UNITED STATES OF AMERICA, )
                                           )
                   Defendant. )
_____)

Case No. C06-0802RSL

ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on the "United States' Motion for Summary Judgment" (Dkt. # 28) and "Plaintiffs' Motion for Partial Summary Judgment" (Dkt. # 30). Plaintiffs seek a refund of amounts paid to the Internal Revenue Service for the calendar years ending December 31, 1999, and December 31, 2000. Plaintiffs argue that stock they received in 1999 and 2000 should not have been reported as gross income during those years because the stocks were not transferrable and were subject to a substantial risk of forfeiture until January 2001.

**BACKGROUND**

This case arises from plaintiff Bernee Strom's exercise of stock options she received in November 1998 when she began working for InfoSpace, Inc. Strom's right to exercise the options vested over time in accordance with the vesting schedules set forth in the

written stock option agreements. The arrangement was described by InfoSpace as follows:

> ten percent (10%) of the total option would vest upon your start date, ten percent (10%) would vest upon the six month anniversary of your start date, five percent (5%) would vest upon the first anniversary of your start date, and the remaining seventy five percent (75%) would vest in equal monthly increments over the next three years, so long as you are still employed by the Company . . . .

Decl. of Bernee Strom (Dkt. #32), Ex. A. The original exercise price of the options was fixed at $15 per share. Over the course of her employment, InfoSpace's stock price increased dramatically, reaching in excess of $1000 per share in early 2000. Strom exercised her stock options on various dates between September 1999 and July 2000 when the market value of the stock far exceeded the $15 option price.

Strom served as President of InfoSpace, Inc., until January 1, 2000, at which point she became President of its newly-formed venture capital division, InfoSpace Ventures. Strom remained on InfoSpace's Board of Directors until April 7, 2000. She severed all relationships with the company on June 30, 2000. During her tenure, InfoSpace merged with three companies, INEX Corporation, Prio, Inc., and Go2Net. Plaintiffs argue that these mergers made most of the InfoSpace stock Strom acquired non-transferrable between July 1999 and January 2001.

On their federal income tax return for 1999, plaintiffs reported as gross income the difference between the market value of the stock on the dates of exercise and the option price. They did not, however, report any option-related income in 2000. InfoSpace withheld Medicare tax from Strom's 1999 and 2000 wages as if she had recognized income from the exercise of the options in both years. The Stroms now seek a refund of the income and Medicare taxes previously paid.

## ANALYSIS

The Court has jurisdiction over this refund claim under 28 U.S.C. § 1346(a)(1).

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT           -2-

Ordinary summary judgment standards apply. Flintkote Co. v. United States, 7 F.3d 870, 871 (9th Cir. 1993). Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient," and factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).

**A. Rules Regarding Recognition of Income**

The federal tax consequences of exercising an employee stock option are governed by 26 U.S.C. § 83 and 26 C.F.R. § 1.83-7. Generally, income must be recognized on the date a stock option is exercised. There are exceptions, however. If the stock received is not transferable or is subject to a substantial risk of forfeiture, the employee can defer both the determination of the amount of gain realized and inclusion of that gain in the employee's taxable income until the first year in which the stock becomes transferable or not subject to a risk of forfeiture. 26 U.S.C. § 83(a). Section 83(c)(3) provides that, "[s]o long as the sale of property

at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are – (A) subject to a substantial risk of forfeiture, and (B) not transferable." The first issue in this case, then, is whether plaintiff could have sold her shares at a profit at the time she exercised her options between September 1999 and July 2000 without triggering potential liability under § 16(b) (15 U.S.C. § 78p(b)).

**B. Section 16(b) of the Securities Exchange Act of 1934**

Section 16(b) is designed to discourage corporate insiders from taking advantage of their access to non-public information by imposing strict liability for any short-swing profits obtained through the purchase and sale, or sale and purchase, of corporate securities within a six month window.

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of the issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security . . . .

15 U.S.C. § 78p(b). Until 1991, it was not clear whether a transaction in a derivative security, such as an option, should be matched against transactions in the underlying security for purposes of measuring the six month time frame under § 16(b).

After noting confusion and inconsistencies in the case law interpreting § 16(b) and acknowledging that earlier regulations had created opportunities for short-swing profits that evaded the reach of the statute, the Securities and Exchange Commission ("SEC") revised the governing regulations to equate ownership of a derivative security with ownership of the underlying equity security. The SEC reasoned that the negotiation of a fixed stock option price – or the transfer of an option with a set exercise price – was the key event creating the opportunity to profit from a short-swing trade. Ownership Reports and Trading by Officers,

Directors and Principal Security Holders, 56 Fed. Reg. 7242-01, 7248 (Feb. 21, 1991). As discussed in Seinfeld v. Hosp. Corp. of Am., 685 F. Supp. 1057, 1066 (N.D. Ill. 1988), and quoted approvingly by the SEC:

> A person who acquires a call option acquires the right to purchase the underlying stock at a given price. If the price of the stock subsequently rises and the person exercises the option and then sells the stock, the "profit" he earns represents the "swing" in the price, not between the date of exercise of the option and later sale of the stock, but rather between the time he originally purchases the option and the time he sells the stock . . . Because the option holder already owns the right to purchase the stock at a fixed price, his decision to actually exercise the option does not provide him the ability to earn insider profits and thus does not constitute a section 16(b) "purchase."

56 Fed. Reg. at 7250. Thus, the SEC amended its rules in 1991 to make clear that the acquisition of an option, rather than its exercise, constitutes a "purchase" under § 16(b).

Plaintiffs argue that the acquisition date is important only if the option acquired is vested, meaning that the full rights of ownership are not contingent on the passage of time or the occurrence of future events. If the option vests in the future, plaintiffs argue, the vesting should be considered the "purchase" for purposes of § 16(b). This argument fails for a number of reason. First, the 1991 rule revision does not contain an exception for or limitation related to unvested stock options. The SEC evaluated the enforcement problems that had arisen when various definitions of a "purchase" were used by the courts and made a bright-line rule: the acquisition of fixed price derivative securities triggers an insider's opportunity to profit and is, therefore, the significant event under § 16(b). As long as the option has a fixed price, its acquisition is a purchase "whether or not the derivative security is presently exercisable." 56 Fed. Reg. 7252. Even when discussing employee stock options, which not uncommonly involve limitations on transferability and/or vesting schedules, the SEC saw no reason to consider, much less adopt, an alternative triggering event. 56 Fed. Reg. at 7251.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                -5-

Second, the two cases cited by the parties in which unvested stock options were at issue do not support, much less compel, a finding that the vesting date constitutes a purchase under § 16(b). In Dreiling v. Am. Online, Inc., 2005 WL 3299828 (W.D. Wash., Dec. 5, 2005), the court assumed for purposes of a Rule 12(b)(6) motion that "vesting dates have the possibility of triggering Section 16(b) liability as 'purchases.'" The parties were specifically invited to re-argue the issue as the case progressed. As far as the Court can tell, the parties never raised the issue again and the litigation was ultimately resolved on other grounds. The district court's willingness to assume, in the context of a motion to dismiss, that a vesting date could be relevant under § 16(b) is not an endorsement of plaintiffs' position in this case. In Montgomery v. Comm'r of Internal Revenue, 127 T.C. 43 (2006), the taxpayer obtained options that were subject to a vesting schedule. The Tax Court cited and applied the "well settled" rule that the acquisition of a stock option, as opposed to its exercise, is the relevant purchase under § 16(b). 127 T.C. at 58. Apparently neither the taxpayer nor the Tax Court thought the delayed vesting of the options was relevant to the analysis.

Third, as a practical matter, plaintiffs' interpretation could bar employees from selling their stock for long periods of time depending on their existing vesting schedules. Only those employees whose options vested at six-month-plus-one-day or larger increments would be able to sell their stock. Strom, for example, would not have been able to sell any stock until she had been employed by InfoSpace for three and a half years if each and every vesting date triggered a new six month bar.

Finally, the purpose of § 16(b) is better served when the focus is on the grant of the fixed-price option, rather than some later date. As noted above, the opportunity for profit arises when the fixed-price option is acquired. "For example, an insider with knowledge of a positive material development, to be announced shortly, determines that while he wants to retain his existing equity position, he wants to take advantage of the information, so he purchases

issuer warrants. After the public announcement and rise in stock price the insider sells his common stock, obtaining a short-swing profit, knowing that he can replace the shares at a predetermined price since he holds the warrants." 56 Fed. Reg. at 7250. The opportunity to use insider information for personal gain as described in this example is not impacted by either the vesting date or the exercise date. Any profit made is dependent on the exercise price negotiated when the option was acquired: it is the abuse of information possessed by the insider on that date that is targeted by § 16(b). The Court acknowledges that an employee who liquidates her current holdings based on the possession of unvested options is, to some extent, gambling that the options will eventually vest. Nonetheless, the opportunity to make a profit arose when the option was purchased or acquired. No insider information comes into play on the vesting date, making that date a non-event under § 16(b). The SEC has used its rule-making authority to establish a bright-line trigger for § 16(b) liability. In its experience, equating the acquisition date of a fixed-price option with a "purchase" reduces the risk of insider trading and promotes consistency in the case law.

The Court declines plaintiffs' invitation to adopt a trigger other than the one chosen by the SEC. Because the acquisition date of the options in November 1998 constitutes the purchase date under § 16(b), plaintiffs were free to sell the stock in 1999 and 2000.[1]

**C. Plaintiffs' Burden of Proof**

Plaintiffs argue that, even if Strom were not actually barred from selling stock under § 16(b) during the relevant period, she faced a "substantial risk of forfeiture" within the meaning of 26 U.S.C. § 83(a) that justifies the deferred recognition of income.[2] When

---

[1] Plaintiffs belatedly provided the cover and certification pages for the deposition of Joseph P. Weber. Defendant's motion to strike (Dkt. # 36 at 7) is therefore denied.

[2] Defendant's motion to strike Exhibit A to the Decl. of Cori Flanders (Dkt. # 31) is granted. Although the opinions and findings of individual government employees may, in some circumstances, be considered an admission of a party opponent under Fed. R. Ev. 801(d)(2), such evidence is not relevant.

evaluating the risk of forfeiture under § 83(a), the Ninth Circuit considers "the chances the employee will lose his rights in property transferred by his employer." Theophilos v. Comm'r of Internal Revenue, 85 F.3d 440, 447 n.18 (9th Cir. 1996). Under this analysis, one could argue that, because a § 16(b) claim against plaintiff had virtually no chance of success on the merits, her property was not subject to a substantial risk of forfeiture. A special rule applies where a potential § 16(b) claim is at issue, however. If the sale of property at a profit "could subject a person to suit" under § 16(b), her rights to the property are, by definition, deemed to be subject to a substantial risk of forfeiture. 26 U.S.C. § 83(c)(3). Pursuant to this subsection, plaintiff need not show that the sale could have subjected her to *liability* under § 16(b): all she needs to show is that she could have been subjected to *suit*.

Given the lack of any explicit precedent regarding the impact of vesting dates under § 16(b), a suit to recover profits earned through the sale of stock within six months of a vesting date would not have been frivolous. An attorney filing such a claim could have escaped Rule 11 liability on the ground that she was urging a reasonable extension of, or exception to, the SEC's interpretation of § 16(b).[3] One court even allowed such a claim to proceed past the motion to dismiss stage. Dreiling v. Am. Online, Inc., 2005 WL 3299828 (W.D. Wash., Dec. 5,

---

The Court must make a *de novo* determination of plaintiffs' right to a refund: the impressions and conclusions of the IRS during the administrative process are not relevant to the accurate assessment of taxes for 1999 and 2000. See R.E. Dietz Corp. v U.S., 939 F.2d 1, 4 (2nd Cir. 1991) (*de novo* standard of review makes factual and legal determinations of IRS irrelevant); U.S. v. Nordberg, 77 A.F.T.R.2d 96-2158, 1996 WL 170119 at *2 (D. Mass., Apr. 8, 1996) (impressions of IRS employees are not relevant to the judicial determination of a tax liability).

Defendant's motion to strike Exhibit B to the Decl. of Cori Flanders (Dkt. # 31) is denied. Expert evidence regarding the practical implications of the different "purchase" dates assists the Court in understanding the purposes and policies behind this area of the law. Mr. Seltzer's opinion regarding whether a particular claim is frivolous invades the province of the Court, however, and has not been considered.

[3] The reasonableness of such a suit today, after entry of this Order, would be much harder to establish.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT            -8-

2005). Although a full and complete review of the relevant authority would ultimately lead the presiding officer to conclude, as this Court has, that a § 16(b) suit to recover profits based on vesting dates fails as a matter of law, plaintiff would have had to marshal resources and successfully argue matters of first impression in order to defeat such a suit. Based on the legal landscape as it existed in 2000, the Court finds that plaintiff could have been subjected to suit under § 16(b). Therefore, under the special definitions set forth in 26 U.S.C. § 83(c), plaintiff faced a substantial risk of forfeiture and was not required to recognize income until December 23, 2000 (six months after her last vesting date).

**D. "Pooling-of-Interests Accounting" Rules**

In order to defer the recognition of income from December 23, 2000, into 2001, plaintiffs argue that the rules governing an accounting method used by InfoSpace in the INEX, Prio, and Go2Net mergers precluded the transfer of Strom's stock during 1999 and 2000. Pursuant to 26 C.F.R. § 1.83-3(k), property is subject to a substantial risk of forfeiture under § 83 if it is "subject to a restriction on transfer to comply with the 'Pooling-of-Interests Accounting' rules set forth in Accounting Series Release Numbered 130 . . . and Accounting Series Release Numbered 135 . . . ." In order for a merger to qualify for pooling-of-interests accounting, the business combination must represent a sharing of rights and risks among the shareholders of the merging entities. The SEC has determined that pooling treatment is not appropriate if stock issued in a merger is sold before "financial results covering at least 30 days of postmerger combined operations have been published." 38 Fed. Reg. 1734-35. The Accounting Series Releases ("ASRs") mentioned in § 1.83-3(k) preclude only post-merger sales: they do not mention or include any limitation on the transfer of stock before the combination occurs.

In November 1986, the SEC issued Staff Accounting Bulletin ("SAB") No. 65 which provides "the staff's views on certain matters involved in the application of Accounting

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT               -9-

Series Release Nos. 130 and 135 regarding risk sharing in business combinations accounted for as pooling of interests." SAB 65 is not a rule or interpretation of the Commission. Rather, it represents "interpretations and practices followed by the Division of Corporate Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal Securities laws." Neither party has addressed the legal import of such bulletins or explained how or why SAB 65 affects the analysis under 26 C.F.R. § 1.83-3(k).

If this Court were asked to construe the requirements for pooling-of-interests accounting, it would not only look to the SEC's official opinions and interpretive releases, but would also take into consideration how the SEC staff applies the accounting rules. See U.S. v. Nacchio, 519 F.3d 1140, 1162 (10th Cir. 2008) (court took its "cue from SEC guidelines," including the SABs). In the context of this case, however, the Court must interpret and apply 26 C.F.R. § 1.83-3(k), not the general rules of pooling-of-interests accounting. Pursuant to § 1.83-3(k), a restriction on transfer will delay the realization of income if the restriction is designed "to comply with the accounting rules set forth in" ASR # 130 and ASR # 135. As noted above, those Releases preclude only postmerger sales of stock. Section 1.83-3(k) neither states nor implies that other requirements of pooling-of-interests accounting delay the realization of income. Under the canon of construction *expressio unius est exclusio alterius,* when a regulation "limits a thing to be done in a particular mode, it includes a negative of any other mode." Raleigh & Gaston Ry. Co. v. Reid, 80 U.S. (13 Wall.) 269, 270 (1871). See also Norman J. Singer, 2A Sutherland Statutes and Statutory Construction § 47:23 (7th ed. 2007).[4] The specificity of § 1.83-3(k) in identifying the sources of the relevant rules (ASR # 130 and ASR # 135) suggests that rules set forth elsewhere cannot be used to delay the realization of

---

[4] The Court recognizes that *expressio unius* is simply a rule of interpretation reflecting the common meaning of a particular manner of expression. If the regulation, taken as a whole, or the stated purpose of the regulation suggest that some other meaning is appropriate, *expressio unius* will not compel an irrational result. Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1312-13 (9th Cir. 1992).

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                -10-

income.  The particularized identification of only two SEC documents would lead a taxpayer to those two Releases, both of which restrict postmerger sales of stock.  Because the parties have not identified any justification for expanding the limited enumeration of SEC documents to include all writings related to the pooling-of-interests accounting method, the Court will apply the rules of statutory construction and conclude that 26 C.F.R. § 1.83-3(k) recognizes a limitation on the transferability of stock only after the merger has occurred.

Even if the Court assumes that 26 C.F.R. § 1.83-3(k) incorporates the premerger moratorium on sales discussed in SAB 65, Strom was not employed by InfoSpace thirty days before the October 2000 consummation of the Go2Net business combination.  Thus, any embargo on stock sales that was triggered by the Go2Net merger did not apply to Strom because she was no longer affiliated with either company.  Plaintiffs argue that the 30-day window discussed in SAB 65 is simply a guideline and that InfoSpace had adopted a more stringent policy that precluded stock sales beginning 30 days prior to the date a merger was announced. Because the Go2Net merger was announced in July 2000, plaintiffs argue that Strom's position as President of InfoSpace Ventures subjected her to this internal policy.

The Court agrees that SAB 65 is a guideline.  As noted above, the Bulletin has not been officially approved or adopted by the SEC:  it simply provides the public with information regarding how the SEC is administering the pooling-of-interests accounting rules.  At present, the staff is inclined to assume that stock sales occurring more than 30 days before a merger is complete do not threaten the sharing-of-risks requirement.  The staff could reevaluate this assumption at any point and/or the facts of a particular case could trigger suspicions about the applicability of the pooling-of-interests accounting method even if the 30-day moratorium is honored.  Assuming InfoSpace put in place a much longer bar on transfers in an attempt to ensure that its choice of accounting method is unassailable, such precautions would be sensible and prudent given the unofficial nature of SAB 65.  Such precautions would not, however, delay

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT            -11-

the date on which income must be recognized. No matter how broadly one reads 26 C.F.R. § 1.83-3(k), the only restrictions that matter are those that are designed to ensure compliance with the pooling-of-interests accounting rules. Plaintiffs have not identified any rule that precludes sales before a merger is announced – in fact, the SEC staff rejected using the announcement of the merger, much less a date preceding the announcement, as the trigger for a moratorium on sales. SAB 65. Nor is there any reason to think that the IRS intended to allow corporations to control the timing of income through unilateral policies. As a general matter, income is to be recognized when the property acquired by the taxpayer is transferrable and is no longer subject to a substantial risk of forfeiture. 26 U.S.C. § 83(a). Absent an SEC or IRS rule barring sales prior to the announcement of a merger, Strom faced no risk of forfeiture because of the pooling-of-interests accounting rules.

## CONCLUSION

For all of the foregoing reasons, the United States' motion for summary judgment (Dkt. # 28) is GRANTED in part and DENIED in part. Plaintiffs' motion for partial summary judgment (Dkt. # 30) is also GRANTED in part and DENIED in part. The gains realized from Strom's exercise of stock options in 1999 and 2000 were transferable and not subject to a substantial risk of forfeiture as of December 23, 2000. Plaintiffs are therefore entitled to a refund of taxes paid on amounts erroneously included in Bernee Strom's income for the year ending December 31, 1999. Because these gains had to be recognized as income in 2000, plaintiffs are not entitled to a refund of any amounts paid for the year ending December 31, 2000.

Dated this 6th day of October, 2008.

Robert S. Lasnik
United States District Judge

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                -12-